Edgar **LABAT**

v.

**The Honorable John McKEITHEN, Governor of the State of Louisiana, the Honorable H. L. Hanchey, Acting Warden of Louisiana State Penitentiary.**

Civ. A. No. 3107.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

July 27, 1965.

Benjamin E. Smith, Smith, Waltzer, Jones & Peebles, New Orleans, La., for plaintiff.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Thomas W. McFerrin, James E. Phillips, Jr., Sp. Counsel, Baton Rouge, La., for defendants.

WEST, District Judge.

The two questions presented for determination in this suit are first, whether or not a state has the right, by legislation, to regulate, control, and limit the correspondence which a death row prisoner may carry on with persons outside of the penitentiary, and secondly, whether or not Louisiana has, by statute, legally done so. This Court answers both questions in the affirmative.

Plaintiff, Edgar Labat, has been confined to the Louisiana State Penitentiary, at Angola, Louisiana, on death row, since 1957, under sentence of death for having committed the crime of rape. His appeals to both state and federal courts have been many, and during the time required for each new appeal to make its way to the United States Supreme Court and back, some new decision, in some other case, has been handed down by that Court, with retroactive effect being given thereto, affording a new ground for an-other appeal to the federal courts by plaintiff. Thus, as this process continues, time passes on and plaintiff remains in death row at the Louisiana State Penitentiary, with the hands of the State of Louisiana effectively tied insofar as carrying out the verdict of the jury and the sentence of the trial court is concerned. In the meantime, plaintiff contends that his constitutional rights under the First, Eighth and Fourteenth Amendments to the United States Constitution are being violated by certain restrictions placed upon his freedom to carry on correspondence with persons outside the penitentiary. He complains that the restrictions are in violation of his right to free speech, to the equal protection of the laws, and to the privileges and immunities of the law, and that they subject him to cruel and unusual punishment.

The particular statute which respondents contend legally curtails plaintiff's right to carry on unlimited correspondence is LSA–R.S. 15:568, which provides as follows:

"The warden of the Louisiana State Penitentiary at Angola, or a competent person selected by him, shall execute the criminal in conformity with the death warrant issued in the case. Until the time of his execution, the convict shall be kept in solitary confinement at the Louisiana State Penitentiary at Angola and no one shall be allowed access to him without an order of the court except the officers of the prison, his counsel, his physician, his spiritual adviser, his wife, children, father, mother, brothers and sisters."

Prior to January 21, 1964, the plaintiff, as well as all other residents of death row at Angola were permitted to carry on virtually unlimited written correspondence with persons other than those listed in the above quoted statute. In other words, the provisions of that statute were simply not strictly enforced. For some time prior to January 21, 1964, Labat had been corresponding with a

white woman by the name of Mrs. Solveig Johansson, of Stockholm, Sweden. As Labat's case, by virtue of his many appeals to the courts, received wider publicity, the volume of mail to him and to other inmates of death row, particularly from women of foreign countries, increased. According to the testimony of Mr. Hanchey, an employee of the penitentiary, who, subsequent to July, 1964, became warden, much of this correspondence coming to the inmates on death row was of a pornographic nature. The officials at the penitentiary became concerned about the volume and nature of the mail directed to the inmates on death row, and concluded that it was not compatible with good prison administration to allow this to continue. When the correspondence was terminated by the prison officials, Mrs. Johansson wrote to the warden inquiring as to the reason why she could no longer correspond with Labat. On January 21, 1964, a letter was sent to Mrs. Johansson, signed by a Mr. LeBlanc, who was apparently employed on the prison staff, in reply to her letter, in which the provisions of LSA–R.S. 15:568 were cited as a reason for the termination of the correspondence. Unfortunately, in the same letter, the prison employee who wrote the letter also stated:

"Please be advised that you have been denied correspondence privileges because of existing rules and regulations set forth by the Office of the Warden in keeping with the laws of the State of Louisiana. Under said laws, correspondence is not permitted unless the correspondents are of the same race."

While this comment in the letter was entirely unnecessary in order for the prison officials to regulate the correspondence between these inmates and the outside world, nevertheless it drew considerable attention not only from the press, but also from certain foreign women who seemed, for some unexplained reason, deeply concerned about the manner in which the prisons in this country are administered. When this letter, with

its attendant publicity, came to the attention of Mr. O. C. Sills, who became Director of Institutions in 1964, he immediately investigated and found that there never had been any "existing rules and regulations set forth by the Office of the Warden" which prohibited correspondence between persons of different races. On the contrary, such correspondence had been permitted and had been carried on quite regularly until January of 1964, when, as previously pointed out, the volume and nature of the correspondence became such as, in the opinion of the prison administrators, to require some means of control. Since, after having notified some of the foreign correspondents that they could no longer correspond with these inmates, the right of the prison officials to do so was challenged, Mr. Sills requested an opinion from the Attorney General for the State of Louisiana as to whether or not the provisions of LSA–R.S. 15:568, cited in the letter to Mrs. Johansson, were sufficient authority for the prison officials to so regulate the correspondence of prisoners on death row. The opinion rendered by the Attorney General follows:

"Dear Mr. Sills:

"Your letter of September 18, 1964, addressed to the Attorney General, was received on September 21, 1964, and it has been referred to me for attention.

"You wish to know whether a person who has been sentenced to death, and who is being kept in solitary confinement at the Louisiana State Penitentiary until the time of his execution, may be permitted to correspond and communicate in writing with persons outside the prison. A specific instance is given where the prisoner under sentence of death has been corresponding with a person residing in a foreign country.

"R.S. 15:568, which was amended by Act 18 of the Extra Session of 1956, reads as follows:

'The warden of the Louisiana State Penitentiary at Angola, or a

competent person selected by him, shall execute the criminal in conformity with the death warrant issued in the case. Until the time of his execution, the convict shall be kept in solitary confinement at the Louisiana State Penitentiary at Angola and no one shall be allowed access to him without an order of the court except the officers of the prison, his counsel, his physician, his spiritual adviser, his wife, children, father, mother, brothers and sisters.'

"The only persons who are to be allowed access to the condemned prisoner are those designated in the statute, namely, the officers of the prison, the prisoner's counsel, his physician, his spiritual adviser, his wife, children, father, mother, brothers and sisters. No relatives of the prisoner, other than those designated in the statute, are allowed access to him. Of course, other persons may have access to the prisoner under a proper court order.

"If the persons referred to in the above quoted Section are allowed access to the prisoner, it would seem to follow, in our opinion, that such designated persons could be permitted to communicate with the prisoner in writing, subject to such precautionary measures as the officers of the prison might see fit to prescribe.

"We are of the opinion, for the reasons hereinafter stated, that a person held in solitary confinement awaiting execution should not be allowed to correspond or communicate in writing with persons outside the prison other than with those specifically designated in the statute.

"It is significant that the words 'kept in solitary confinement' are used, rather than the words 'kept in close confinement.' Solitary confinement and close confinement do not import the same kind of punishment (Rooney v. State of North Dakota, 196 U.S. 319, 25 S.Ct. 264, 49 L.Ed. 494).

"Solitary confinement means complete isolation of the prisoner from all human society. He is to have no direct intercourse with or sight of any human being and no employment or instruction. See the cases of Re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835, and Leach v. Whitbeck, 151 Mich. 327, 115 N.W. 253. If a person in solitary confinement were to be permitted to communicate in writing with any person he chooses, he would have access to such person, at least in a limited sense, and we believe that this is not contemplated by the statute. If the prisoner were to be permitted to receive letters from the public, and to reply thereto, there would be no complete isolation of the prisoner from all human society.

"Sincerely yours,
/s/Harry Fuller
HARRY FULLER
Second Assistant Attorney General"

■■■ This Court agrees completely with the above quoted opinion. While there seems little doubt that the prison officials could not, constitutionally, prevent a colored inmate from corresponding with a white person on the outside merely because of the difference in their races, nevertheless, it is equally clear that the State has every right to place all reasonable and necessary restrictions upon the activities of inmates in a penitentiary, just so long as the restrictions imposed are not discriminatorily based on racial considerations. There is no question but that the prison officials, if permitted by state law, can place greater and more onerous restrictions on one class of prisoner than is placed on another. This is an obvious requirement of good prison administration. For example, far greater liberties are granted to a so-called "trusty" than are granted to maximum security prisoners. This is just common sense. A person incarcerated for the commission of some relatively minor crime is generally considered a subject for rehabilitation, while an in-

mate confined to death row, awaiting execution for the commission of a capital offense, is confined for an entirely different purpose. Certainly enlightened prison administration calls for an entirely different handling of these two categories of prisoners. Plaintiff complains that he is being deprived of certain of his constitutional rights by the prison authorities. Indeed, he is being deprived of many of the rights of a free, law abiding citizen, but he is being deprived of those rights by due process of law. If the state has the right to deprive him of his very life, through execution for the commission of a capital offense, then certainly it has the right, as a part of the ultimate punishment, to deprive him of other privileges along the way to the final reckoning, just so long as such deprivations are imposed according to law, and on a non-discriminatory basis.

It is significant to note that not only may an inmate on death row, pursuant to the statute involved, have access to all of the persons designated therein, but also, by order of Court, to persons other than those designated therein. By stipulation in this case it was agreed that neither the plaintiff nor any of the other inmates whom he purports to represent have ever sought a court order permitting them to correspond with persons other than those enumerated in the statute. Also, it was stipulated that neither the plaintiff nor any of the other inmates whom he purports to represent have ever been denied access in any form to any of the persons designated in the statute.

As was stated in Adams v. Ellis, et al., 197 F.2d 483 (C.A.5 1952):

"'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' * * * it is not the function of the Courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined. Sarshik v. Sanford, 5 Cir., 142 F.2d 676; Platek v. Aderhold, 5 Cir., 73 F.2d 173."

As further pointed out in Adams v. Ellis, supra, this is not to say that a case could not arise where the punishment, treatment, or deprivation inflicted could be a deprivation of a prisoner's rights. Such, for example, could be the case where the punishment inflicted was inflicted on a discriminatory basis because of a person's race or color. But such is not the case here. LSA–R.S. 15:568 is non-discriminatory on its face, and is being applied to all prisoners occupying death row at Angola on a non-discriminatory basis.

In United States ex rel. Dewey McDade Thompson, Jr. v. Edward M. Fay, Warden, Green Haven Prison, D.C., 197 F.Supp. 855, in holding that refusal by prison authorities to allow the plaintiff, an inmate, to mail certain letters, did not violate any federal rights guaranteed or protected either by the United States Constitution or by 42 U.S.C.A. §§ 1983, 1985, the Court said:

"Prisoners lawfully confined to state penitentiaries have no absolute right to the use of the mails. As with many civil rights and privileges, this one yields to the internal discipline of a large prison. (Citing authorities). Thus, the mere withholding of petitioner's letter by prison authorities is not a violation per se of any federal right. * * * This is not a case where prison authorities have interfered with an inmate's access to counsel or to the courts, as in Bailleaux v. Holmes, D.C.Or.1959, 177 F.Supp. 361, 364. Nor are we concerned here with the deprivation of any constitutional right, such as freedom of religion, as in Pierce v. LaVallee, 2 Cir., 1961, 293 F.2d 233. * * * Thus, the subject matter of the letter is not protected by any constitutional or other federal right. The petition, therefore, fails to state a claim under the Civil Rights Act."

In brief, the federal courts do not, apart from due process considera-

tions, have the power to supervise or regulate the ordinary control, management and discipline of the inmates of prisons operated by the states. The Civil Rights Statutes confer no such power upon the federal courts. Jefferson v. Heinzie, D.C., 201 F.Supp. 606 (1962).

Thus, it appearing conclusively from the face of the statute here involved, and from the depositions filed herein, and from the stipulations and agreements entered into by counsel, that said statute is neither unlawful nor discriminatory on its face, nor is it in any way being applied in a discriminatory manner, no federally guaranteed or protected rights of plaintiff have been or are being violated by the respondents, and thus, petitioner's complaint fails to state a claim upon which relief can be granted. Defendants' motion to dismiss will therefore be granted. Judgment will be entered accordingly.