Billy Wayne SINCLAIR

v.

C. Murray HENDERSON.

Misc. No. 1102.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

Sept. 21, 1971.

Edwin M. Callaway, Richard C. Hand, Legal Aid Society of Baton Rouge, Baton Rouge, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen. of La., Stacey Moak, Asst. Atty. Gen., Baton Rouge, La., for defendant.

E. GORDON WEST, Chief Judge:

Billy Wayne Sinclair, an inmate of the Louisiana State Penitentiary incarcerated on "Death Row", brought this suit for a declaratory judgment, a preliminary injunction, and a permanent injunction against Louis Sowers, individually and in his official capacity as Director of the Louisiana Department of Corrections; against A. J. Lyons, Douglas L. Manship, H. C. Peck, and J. L. Walker, individually and in their official capacities as members of the Louisiana Board of Corrections; and against C. Murray Henderson, individually and in his official capacity as Warden of the Louisiana State Penitentiary.

Jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1343 (3) and (4) which provides for original jurisdiction of the federal district court in all suits authorized by 42 U.S.C. § 1983 to redress the deprivation under color of state law of any right, privilege, or immunity secured by the Constitution

of the United States or by an act of Congress providing for equal rights or civil rights of all persons within the jurisdiction of the United States. Jurisdiction to grant declaratory and injunctive relief is conferred by 28 U.S.C. §§ 2201 and 2202.

Sinclair, who was tried and convicted of murder, was sentenced to death on March 1, 1967 and has been incarcerated on "Death Row" at Louisiana State Penitentiary since that date pursuant to La.R.S. 15:568. He contends that the conditions of this confinement amount to cruel and unusual punishment in violation of the Eighth Amendment rights and to a denial of his rights to due process guaranteed by the Fourteenth Amendment. Specifically he contends that the following conditions constitute a violation of the constitutional rights of inmates at the penitentiary:

1. Inmates are afforded inadequate medical attention.

2. Meals are served in an unsanitary manner.

3. Inmates have inadequate plumbing facilities.

4. Cells are inadequately ventilated.

5. Bedding is inadequate.

6. Prison officials improperly censor correspondence.

7. Use of inmate guards violates constitutional rights.

8. There is a lack of procedural due process in connection with imposing punishment on inmates for violation of prison regulations.

9. Lack of exercise facilities for inmates on Death Row constitutes cruel and unusual punishment.

On May 17, 1971, in compliance with the decision rendered by the Fifth Circuit Court of Appeals in Sinclair v. Henderson, 435 F.2d 125 (CA5—1970), this Court held an evidentiary hearing to determine whether the conditions on "Death Row" were contrary to the Eighth Amendment prohibition against cruel and unusual punishment. After due consideration of the testimony adduced at that hearing, the Court now makes the following findings of fact and conclusions of law as to each of plaintiff's complaints.

## MEDICAL ATTENTION

Petitioner Sinclair apparently suffers from headaches, muscular aches, and a loss of appetite. He states that he spends most of his time in bed. While there was evidence that other Death Row inmates have such physical complaints as back trouble, mental depression, dental problems, and headaches, there was no testimony to indicate that petitioner unduly suffered from any of these infirmities, nor was there any evidence that there was any such lack of medical care as to reach the proportion of a denial of constitutional rights. There is no reason to doubt that these inmates suffered from the minor ailments described by them. But the medical care available to them was not shown to be inadequate. In order to state a claim for relief, the complaint must allege an abuse of discretion by prison authorities in providing medical treatment for prisoners. Lawrence v. Wainwright, 440 F.2d 379 (CA5—1971). In order to obtain relief, the evidence must support such a claim. There was no such evidence in this case. Even Dr. Daniel S. Bloonmenthal, one of the complainant's witnesses, stated that the inmates "seem to receive adequate and substantial medical attention."

The petitioner also complains about a lack of adequate psychiatric care. This allegation is also not supported by the evidence. The uncontradicted evidence shows that psychiatric care is available to all inmates two days out of every week.

Petitioner complains that seeing the "pill man" was a prerequisite to seeing the doctor and that leaving death row for medical attention entailed being confined in shackles. Nothing in the evidence indicated, however, that an inmate could not see a doctor if one was needed. Apparently there have been sit-

uations where an inmate did not ask for medical treatment because of all the "trouble" involved, i. e., being subjected to security precautions, but we are not convinced that the procedures were unduly cumbersome or unreasonable. The fact remains that the inhabitants of death row have been duly tried and convicted of capital offenses and the prison authorities would indeed be derelict in their duty if they did not take all security precautions when handling these inmates. There is no merit to petitioner's complaint in this respect.

## CONTAMINATED FOOD

Almost all of the inmates who testified complained about the food. They reported that roaches, worms, human hair, wire, paper clips, small rocks, etc. had been found in the food. Charles Jewell, on the other hand, who has been employed as a supervisor on death row for the past seven years, stated that he had never seen contamination in the food; but William Kennedy, the inmate guard who normally serves the prisoners, stated that on one occasion he was present when a death row inmate found a roach in his food. On that occasion the food was thrown away and the inmate was given another tray. The inmates who testified also complained that some of the guards who serve the food in William Kennedy's absence are, at times, unclean.

■ The testimony did not indicate that contaminating items appeared in the food on a regular basis or that the food servers were, as a general rule, unclean. On the contrary, the evidence, when carefully scrutinized, showed that as a general rule the food served to inmates was good, wholesome, clean, and palatable. It is the same food served to and eaten by the regular employees of the prison. An occasional incident of a foreign object finding its way into the food, while regrettable, does not raise a question of constitutional proportion. It simply raises a problem of internal prison administration to be dealt with by the prison authorities as best they can.

## PLUMBING

■ There is a toilet in each cell on death row and the petitioner alleges that the toilets frequently over flow or "bubble up" into the cell. The authorities are aware of this problem, however. Warden Henderson testified that the plumbing problem is not confined to the death row area but exists throughout the institution. Furthermore, he indicated that the entire plumbing and drainage system is now being "revamped." Until such time as the overall plumbing problem at Angola is corrected, the authorities are apparently doing the best they can to keep the old system in working order. Petitioner Sinclair verified that if a complaint is made a plumber is called to correct the problem. The supervisor, Charles Jewell, stated, furthermore, that the toilets do not overflow nearly as often as the inmates would have us believe. This Court is convinced that this problem is not of constitutional proportions.

## VENTILATION

■ Petitioner complains of inadequate ventilation. The testimony shows that a new ventilation system is presently being installed in death row and, according to Warden Henderson, it will then be "one of the best buildings at Angola." This new system will change air in the building every 60 seconds. Therefore, any complaint grounded on inadequate ventilation is now moot.

## MATTRESSES

■ Petitioner complains about the mattress on his bed. Dr. Daniel S. Bloomenthal was of the opinion that bad mattresses and a lack of exercise could cause a curvature of the spine. There is no constitutional right for an inmate on death row to be furnished with an orthopedically approved mattress. The type of furnishings given an inmate is a matter of prison administration. It is not cruel and unusual punishment to be denied the exact kind and quality mattress that an inmate might prefer.

There is no merit to this complaint. The evidence did show, however, that the institution is in the process of replacing old mattresses with new ones.

## CENSORSHIP AND CORRESPONDENCE

■ Petitioner complains that censorship of his correspondence by the prison authorities violates his rights under the First, Sixth, and Fourteenth Amendments. Warden Henderson acknowledged in his deposition that pursuant to authority contained in LSA–R.S. 15:568, all incoming and outgoing mail was opened and read, including mail to and from attorneys and courts. But there was no evidence presented of any deletions by prison officials in legal correspondence or refusal to mail such correspondence. This is not the first time that this Court has had to interpret La. R.S. 15:568. In Labat v. McKeithen, 243 F.Supp. 662 (E.D.La.1965), aff'd 361 F.2d 757 (CA5—1966), we held that limiting the correspondence of inmates on death row to those persons designated in the statute was constitutionally permissible so long as it was not applied in a racially discriminatory manner. We went on to say that the prison officials can place more onerous restrictions on one class of prisoner than another, if permitted by State law.

The Court is not unaware of the fact that there has been a growing recognition by federal courts that prison censorship can, under some circumstances, constitute an overbroad interference with a prisoner's right of access to the courts, his right to communicate with counsel, and his freedom of speech. In some recent district court cases, injunctions have issued prohibiting prison authorities from opening and reading a prisoner's correspondence with attorneys and courts. These decisions have emphasized that there was no showing that such a prohibition would jeopardize prison administration, security, or discipline. There is only the remote and speculative danger that attorneys will help the prisoner engage in illegal activ-

ity. Marsh v. Moore, 325 F.Supp. 392 (D.Mass.1971); Peoples v. Wainwright, 325 F.Supp. 402 (M.D.Fla.1971); Meola v. Fitzpatrick, 322 F.Supp. 878 (D. Mass.1971); Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970).

The most recent Circuit Court decision in this area, on the other hand, is Sostre v. McGinnis, 442 F.2d 178 (CA2 —1971). The Second Circuit Court, sitting en banc, ruled that all prison correspondence could be opened and read, but that the authorities could not delete material from the letters or refuse to mail letters to attorneys, courts, or public officials except in extreme circumstances.

The Fifth Circuit Court of Appeals has frequently stated that the control of mail is a matter of prison administration. Brown v. Wainwright, 419 F.2d 1308 (CA5—1969); Diehl v. Wainwright, 419 F.2d 1309 (CA5—1970); Labat v. McKeithen, supra. This Court agrees with and is bound by these Fifth Circuit decisions. Under the circumstances of this case, neither the reading of petitioner's mail nor the limitation placed on prisoner correspondence violates petitioner's constitutional rights.

## INMATE GUARDS

■ This is not the first time that the constitutionality of the use of inmate guards at the penitentiary has been questioned in this Court. On April 6, 1971 we decided D'Artois v. Sowers, et al (unpublished opinion) which raised this same question. In that case we referred to George v. Sowers, an unpublished decision by the Nineteenth Judicial District Court of the State of Louisiana which considered this question in detail, and we stated that we believed that the use of convict guards at Angola had not been shown to be a violation of the Eighth Amendment prohibition against cruel and unusual punishment. We affirm this position once more.

The petitioner testified that convict guards were in charge of death row. He stated that the guards refuse to get help when it is needed and that they

"threaten the lives of death row prisoners." Daryl Evans, another prisoner on death row, testified that the inmate guards "gave them trouble." Emmett Henderson however stated that the only trouble with the inmate guards was that sometimes when the guard was called he did not come. Eugene Scott apparently believed that he had been wronged. He reported an instance when a guard spilled hot coffee on him, although the guard said that it was an accident. He also reported that the inmate guards would not answer when prisoners called. Both Earl Williams and Edward Crook reported that they too had had "trouble" with inmate guards.

The most common difficulty reported by the death row prisoners was the lack of responsiveness on the part of inmate guards. There was no indication that any prisoner was harmed because of inattention. The only specific complaint of abuse was one instance of spilled hot coffee, and we are certainly not prepared to say that this raises a question of constitutional proportion. Contrary to petitioner's testimony, a "free man" as they are called, is the supervisor on death row and has been for the past seven years. Convict guards are not in charge. Furthermore, as was brought out in the State Court in the *George* case, convict guards are being phased out on a monthly basis at Angola.

## PROCEDURAL DUE PROCESS

Sinclair contends that the prison procedures for imposing punitive segregation (incarceration in the "hole") subject him to the possibility of additional punishment without minimal procedural safeguards in violation of the due process clause of the Fourteenth Amendment. From the testimony in this case, the Court is convinced that no specific disciplinary rules or regulations have ever been communicated to the prisoners at Angola. There are no published regulations defining offenses or setting forth any specific schedule of penalties. The determination to impose punitive segregation is apparently left to the discretion of individual guards. The prisoner is given no official notice of the specific charge against him and no opportunity to be heard.

Although the petitioner has never been disciplined personally, others have been. And it is obvious that all of the death row inmates, including the petitioner, are affected in some way by this lack of standards.

Petitioner would have the Court require that rules and regulations be promulgated to apprise prisoners of what conduct can subject them to discipline and what the penalty will be. Additionally, he would have the Court require written notice of the charge against a prisoner; an opportunity to present a defense, including the right to call witnesses and to cross-examine accusers; an opportunity to be represented by a person of the prisoner's choice; and a "trial" by an impartial tribunal composed of persons other than prison employees. Petitioner asks for more than he is entitled to.

It is, however, clear that although a prisoner loses many of his constitutional rights when he enters prison, he retains certain basic ones. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). For example, it is generally recognized that the right to procedural due process in connection with the imposition of additional serious punishment on prisoners is a right that is not lost. "Where the lack of effective supervisory procedures exposes men to the capricious imposition of added punishment, due process and Eighth Amendment questions inevitably arise." Landman v. Peyton, 370 F.2d 135, 141 (CA4—1966). See also Sostre v. McGinnis, 442 F.2d 178 (CA2—1971); Nolan v. Scafati, 430 F.2d 548 (CA1—1970); Alverez v. Turner, 422 F.2d 214 (CA10—1970).

Some of the federal district courts which have considered the procedural due process question in cases involving imposition of "punitive segregation" have required detailed regulations for conduct and rules for punishment pro-

ceedings which encompass most of the protections afforded one criminally accused at trial. Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970), aff'd in part and rev'd in part, Sostre v. McGinnis, 442 F.2d 178 (CA2—1971); Morris v. Travisono, 310 F.Supp. 857 (D.C.R.I.1970).

On the other hand, other district courts and the few circuit courts which have been confronted with similar grievances have indicated that only minimal standards of procedural due process are constitutionally required. Sostre v. McGinnis, supra; Nolan v. Scafati, supra; Landman v. Peyton, supra; Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y.1970); Rhem v. McGrath, 326 F.Supp. 681 (S.D.N.Y. 1971).

Considering the traditional reluctance of the courts to interfere with internal processes of prison administration except in extreme cases, this Court considers the latter approach to be the better one.

■ Three procedural safeguards are constitutionally required by the Due Process Clause of the Fourteenth Amendment: 1. There must be rules and regulations officially promulgated by prison authorities and communicated to the prisoner apprising him of what conduct can subject him to serious discipline, what penalty he can expect and the procedure by which such a determination will be made. (This would seem to be required, in any event, by state law. La.R.S. 15:829 states: "Discipline of Inmates: The director of corrections shall prescribe rules and regulations for the maintenance of good order and discipline in the facilities and institutions under the jurisdiction of the department, which rules and regulations shall include procedures for dealing with violations thereof. A copy of such rules and regulations shall be furnished each inmate. Corporal punishment is prohibited.") 2. The prisoner must be given official written notice of the specific charge against him. 3. Before serious punishment (such as punitive segregation) can be imposed, the prisoner involved must be given a hearing at which he shall have an opportunity to be heard. The determination to impose the punishment should be made by one other than the accusing guard.

## EXERCISE

■ A more serious matter is presented, however, by petitioner's complaint concerning the lack of physical exercise opportunities afforded to inmates on Death Row at Angola. The testimony in this case reveals that the inmates on Death Row at Angola are housed in a building separate and apart from the regular dormitories. They live in cells measuring approximately 6 feet by 9 feet. The building is so situated that practically no sunlight ever enters the cells. In this small area are located the inmate's bed, a toilet, a writing table, radio, television, and other personal effects. During each 24 hour period the inmate is allowed out of this small cell for only 15 minutes. During that time he may go down a closed in corridor to a shower room where he must bathe, wash clothes, and supposedly exercise, all in a matter of 15 minutes. The inmates who testified in this case have been living under this condition for as long as 9 years. Some who did not testify have been there longer than that. When the Warden was asked why these prisoners were not allowed some regular outside exercise, he stated that he was of the opinion that the Louisiana law required that they be kept in "solitary confinement." La.R.S. 15:568 provides:

"The warden of the Louisiana State Penitentiary at Angola, or a competent person selected by him, shall execute the criminal in conformity with the death warrant issued in the case. Until the time of his execution, the convict shall be kept in solitary confinement at the Louisiana State Penitentiary at Angola and no one shall be allowed access to him without an order of the court except the officers of

the prison, his counsel, his physician, his spiritual advisor, his wife, children, father, mother, brothers and sisters." As amended Acts 1956, Ex. Sess., No. 18, § 1.

This Act was passed by the Louisiana Legislature in 1928, at a time when a person convicted of a capital offense was, in accordance with Louisiana law, forthwith executed. Just prior to his execution, he was removed from the regular prison area to Death Row to await execution. While there he was held pursuant to the provisions of La.R.S. 15:568. His stay on Death Row was short. This statute did not contemplate an inmate spending year after year on Death Row. This situation has developed as a result of the apparent "moratorium" which the United States Supreme Court has placed on executions. The interminable appeals with their attendant interminable delays now available to prisoners as a result of the apparent unwillingness of the United States Supreme Court to allow a State to administer the death penalty in accordance with its laws in capital cases has resulted in a situation where condemned prisoners are now held on Death Row for *years* instead of *days*, awaiting an execution which will probably never take place. It is unfortunate that the United States Supreme Court has not yet seen fit to face squarely the question of whether or not capital punishment is violative of the United States Constitution as constituting cruel and unusual punishment. Problems such as are here presented would be easily and quickly solved if they would but do so. In the meantime, the prisoners involved are living under a valid death sentence, and the prison authorities have the right to keep them isolated and separate from the other inmates. But the "solitary confinement" contemplated by the Louisiana statute did not contemplate what has developed since 1928. To be held in "solitary confinement" does not necessarily mean to be locked up 23 hours and 45 minutes of each day for years on end as is being done to the inmates on Death Row at Angola. "Solitary confinement" as used in the statute simply means separate confinement with only occasional access to any other person and that only as specifically authorized in the statute. See Black's Law Dictionary, Fourth Edition, p. 1565. There would obviously be nothing violative of this statute if exercise yards were provided for prisoners housed in Death Row. They could be so arranged that reasonable opportunity for exercise could be given without violating the "solitary confinement" provision of the statute. During the hearing before this Court Warden Henderson was asked by the Court whether or not it would be feasible and practical from both an economic sense and a security standpoint for this to be done. He replied that it could be done economically without impairing the security safeguards required. This Court had occasion to pass upon the legality of La.R.S. 15:568 on a prior occasion. In Labat v. McKeithen, 243 F.Supp. 662 (E.D.La. 1965), aff'd 361 F.2d 757 (CA5—1966), it was recognized that prison officials have a right, and indeed, in many instances, a duty, to place more onerous restrictions on one class of prisoners than another if permitted by State law. But the Court was careful to point out in *Labat* that it did not mean to imply that no case could arise where the punishment, treatment or deprivation inflicted could constitute a deprivation of a prisoner's constitutional rights. We believe that this is such a case. While we have been unable to find a prior case dealing with the precise question involved here, i. e., lack of exercise opportunity for prisoners housed on death row, we feel, however, that Morris v. Travisono, 310 F.Supp. 857, 858 (D.C.R. I.1970) is pertinent. While that case dealt with the prison population at large, rather than with just the segment of the population confined to death row, nevertheless the Court did require the State to permit prisoners to have outdoor exercise. The same opportunity must be given to prisoners on Death

Row. Confinement for long periods of time without the opportunity for regular outdoor exercise does, as a matter of law, constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The evidence in this case shows beyond a doubt that it is feasible both economically and from a security standpoint for the defendant to make arrangements for all prisoners on Death Row to have regular outdoor exercise opportunity. This can be done without in any way violating the provisions of La.R.S. 568, and it must be done immediately.

To the extent indicated herein, petitioner is entitled to the relief sought and judgment and order will be entered accordingly.