Frankie Lee BASS, Leonard Bean, Plaintiffs-Appellants,

v.

Everett I. PERRIN, Jr., L.R. Johnson, Richard L. Dugger, Thomas Barton, L.E. Turner, and A.D. Thornton, in their individual and official capacities, Harry K. Singletary, Jr., in his individual capacity, and Michael W. Moore, in his official capacity, Defendants-Appellees.

No. 96-3428.

United States Court of Appeals,

Eleventh Circuit.

April 1, 1999.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-871-Civ-J-10), William Terrell Hodges, Judge.

Before TJOFLAT and ANDERSON, Circuit Judges, and HOEVELER[*], Senior District Judge.

TJOFLAT, Circuit Judge:

The plaintiffs, inmates in the Florida State Prison, challenge certain prison practices and procedures. After careful consideration, we conclude that those practices are within the limits established by the United States Constitution.

I.

Frankie Lee Bass and Leonard Bean are inmates at the Florida State Prison in Starke, Florida. Throughout most of their confinement, each has been in "Close Management," a form of solitary confinement for persons who have proven to be a danger to the rest of the prison population. *See* Fla. Admin. Code Ann. r. 33-3.0083(1) (1990).[1]

Inmates in Close Management are given two hours per week of outdoor exercise, commonly known as "yard." If, however, "clear and compelling facts can document [that] such exercise periods should not be

---

[*]Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

[1]Regulation 33-3.0083 was repealed on October 1, 1995 (subsequent to the filing of this lawsuit), and replaced with regulations 33-38.001 through 33-38.013. The relevant (for purposes of this suit) provisions relating to Close Management remained substantially unchanged.

granted," Fla. Admin. Code Ann. r. 33-3.0083(9)(i) (1990), then an inmate may be placed on the Yard Suspension List ("YSL") and thereby deprived of all outdoor exercise time.[2] The decision to place an inmate on the YSL is made by the prison's Chief Correctional Officer, after a recommendation by the officer in charge of the wing where the inmate's misbehavior occurred. The inmate is not present when this decision is made; he is, however, notified in writing of his placement on the list. The inmate may then file a grievance with prison authorities. If the grievance is denied, the inmate receives a written statement of reasons, and may appeal the decision to the Office of Inmate Grievance in Tallahassee. Furthermore, the YSL is reviewed every month at the Florida State Prison supervisors meeting, and each inmate is discussed to determine whether he should be removed from the list.

Plaintiff Bass was placed on the YSL in October 1989 for possession of two homemade firearms, two handcuff keys, and a package of pulverized match heads. In May 1991, Bass stabbed another inmate, which extended his time on the YSL. He was removed from the list in May 1992. In April 1993, during a yard session, he and plaintiff Bean scaled a fence, commandeered a dump truck (by ejecting the driver at knifepoint), and drove through the perimeter fence in an attempt to escape. Bass and Bean were captured and returned to the prison, and Bass was again placed on the YSL. Bass remained on the YSL at the time he filed this lawsuit in June 1993.

Plaintiff Bean was placed on the YSL in May 1983 for the murder of a correctional officer. He was taken off of the list in November 1991. He was returned to the YSL in April 1992 after being found in possession of a homemade plastic handcuff key. He was removed from the list in November 1992, but was returned to the YSL in April 1993 after participating in the escape attempt with Bass, and remained on the YSL when he filed this lawsuit.

---

[2]Actions that lead to placement on the YSL are: recent demonstrations of violence, continuing threats of physical harm toward staff and other inmates, involvement in acts that seriously interfere with the staff's daily security functions, and actions demonstrating an extreme escape risk.

Bass and Bean brought suit *pro se* against various prison officials under 42 U.S.C. § 1983, seeking damages, a declaratory judgment, and an injunction. The district court granted summary judgment for the defendants. Bass and Bean appeal.

II.

Bass and Bean claim that the defendants violated their constitutional rights by placing them on the YSL. Specifically, they claim that the placement is cruel and unusual punishment, that the procedures used in the placement do not comply with the requirements of the Due Process Clause, and that such placement is discriminatory in violation of the Equal Protection Clause. We discuss each of these claims in this section.

A.

The Eighth Amendment—applicable to the states through the Fourteenth Amendment—forbids cruel and unusual punishments. As a historical matter, it is clear that the framers would not have considered the plaintiffs' fate to be cruel and unusual. In 1790, the first modern prison—the Walnut Street Prison in Philadelphia—opened its doors. There, prisoners convicted of serious but noncapital offenses were kept in solitary confinement and, except in cases of medical necessity, never permitted to emerge from their cells. *See* Orlando F. Lewis, *The Development of American Prisons and Prison Customs, 1776-1845,* at 30 (2d ed.1967). These conditions were not considered cruel and unusual; on the contrary, the Walnut Street Prison was the brainchild of Quaker philanthropists and was considered to be on the cutting edge of penological reform. *See id.* at 26-28.

Eighth Amendment violations, however, are not confined to situations that would have been considered cruel and unusual by the Framers. Contemporary standards of decency must be brought to bear in determining whether a punishment is cruel and unusual. *See Ford v. Wainwright,* 477 U.S. 399, 406, 106 S.Ct. 2595, 2600, 91 L.Ed.2d 335 (1986). This fact, however, does not give judges carte blanche to impose their theories of penology on the nation's prisons. Instead, the Supreme Court has, insofar as it is possible, attempted to set forth concrete standards by which courts can measure Eighth Amendment violations. *See*

3

*Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (noting that the Court's "judgment should be informed by objective factors to the maximum possible extent").  In the context of an inmate's conditions of confinement after incarceration, the standard is that prison officials violate the Eighth Amendment through "the unnecessary and wanton infliction of pain."[3]  *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citation omitted).

Placement on the YSL certainly involves the "infliction of pain," at least in the broad sense of that phrase.  *Cf. Rhodes v. Chapman,* 452 U.S. 337, 348-49, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981) (suggesting that placement of two inmates in a single cell might "inflict[ ] pain" for Eighth Amendment purposes).  Although being in solitary confinement with minimal time outside is only marginally different from being in solitary confinement with no time outside, there is nevertheless a significant difference between some time outside—even a minimal amount—and none at all.[4]

The pain inflicted on the plaintiffs, however, cannot be said to be unnecessary—in other words, "totally without penological justification."  *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976).  On the contrary, it would be hard to imagine a situation in which two persons had shown a greater threat to the safety and security of the prison.  Each plaintiff was initially incarcerated for violent crimes:  Bass for robbery, kidnaping, and armed burglary;  Bean for armed robbery.  Since incarceration, each plaintiff has continued to engage in violent behavior:  Bass has been convicted of aggravated battery;  Bean has been convicted of murder and attempted murder.  Each plaintiff has attempted to escape during yard time;  plaintiff Bass, in addition, has five convictions for escape.  Finally, each plaintiff

---

[3]The "wanton" element of the test is based on the Supreme Court's distinction between punishments imposed pursuant to judicial decree and punishments imposed by prison officials.  Punishments of the first type are examined without consideration of the intent with which they are imposed.  On the other hand, "[i]f the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify [as cruel and unusual]."  *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991).

[4]For instance, in the seventeenth century, heirs to the Turkish throne were kept in continual confinement to prevent any possibility of their ascending to the throne via assassination of the present Sultan.  The result was a series of insane rulers.  *See* Noel Barber, *The Sultans* 78-80 (1973).

4

is serving a life sentence with no opportunity for release in the foreseeable future; the incentives for proper behavior by the plaintiffs are therefore minimal. Placement on the YSL was a rational, albeit debatable, response to the substantial threat posed by the plaintiffs.

In addition, the behavior of the defendants cannot properly be described as "wanton." Wantonness has been defined as "deliberate indifference to a substantial risk of serious harm to a prisoner."[5] *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994).[6] The record is filled with evidence indicating that prison officials were very concerned about the potential harm to inmates from placement on the YSL, and took a variety of steps to ensure that the plaintiffs were not harmed as a result of their continuous confinement. The plaintiffs received daily cell-front medical evaluations, and received more thorough medical examinations upon request. Any problems discovered were promptly treated. Furthermore, a booklet (along with training from medical personnel) was made available to the plaintiffs detailing proper methods of exercise while in confinement. The plaintiffs also received weekly cell-front psychological evaluations, and could receive further examinations upon request. We therefore conclude that the defendants were not "wanton" in their conduct.[7] *Cf. Helling v. McKinney,* 509 U.S. 25, 36-37, 113 S.Ct. 2475, 2482, 125

---

[5]Some Eighth Amendment claims require a showing of more than "deliberate indifference" to satisfy the wantonness requirement. For instance, claims of excessive force require a plaintiff to show that the defendants acted with malice. *See Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). Claims based on a prisoner's conditions of confinement, however, are clearly resolved under the deliberate indifference standard. *See id.* at 836, 114 S.Ct. at 1978.

[6]The Supreme Court, in *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 2326-27, 115 L.Ed.2d 271 (1991), defined "wantonness" in the context of Eighth Amendment challenges to conditions of confinement as "deliberate indifference." In *Farmer,* cited in the text, the Supreme Court then clarified the meaning of "deliberate indifference."

[7]Plaintiffs complain of a wide variety of ailments—such as sleeplessness, mood swings, and loss of muscle tone—that they claim have resulted from their placement on the YSL. These ailments do not, for the most part, qualify as "serious harm" for Eighth Amendment purposes. More importantly, the plaintiffs have not produced any evidence of physiological problems that were willfully ignored by the defendants. The plaintiffs' allegations tend to prove, at most, negligence by the defendants in discovering and/or treating their ailments; mere negligence is insufficient to establish the "deliberate indifference" required for an Eighth Amendment claim. *See Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir.1991).

L.Ed.2d 22 (1993) (recognizing preventative measures taken by prison officials as strong evidence that they were not deliberately indifferent to risks of prisoner harm).

The pain suffered by the plaintiffs was thus neither unnecessary nor wanton. We therefore conclude that the complete denial to the plaintiffs of outdoor exercise, although harsh, did not violate the Eighth Amendment.[8]

B.

The plaintiffs also claim that the procedures by which they were put on the YSL were insufficient to satisfy the requirements of the Fourteenth Amendment's Due Process Clause. We disagree.

As an initial matter, we must determine whether the injury claimed by the plaintiffs is within the scope of the Due Process Clause. The Due Process Clause protects against deprivations of "life, liberty, or property without due process of law." U.S. Const. amend. XIV. Clearly the plaintiffs were not deprived of life or property; they are therefore entitled to due process only if they were deprived of "liberty" within the meaning of the Fourteenth Amendment. This is often a difficult determination in the context of a prison, because prisoners have *already* been deprived of their liberty in the ordinary sense of the term. Nevertheless, the Supreme Court has made clear that there are two circumstances in which a prisoner can be further

---

[8]The plaintiffs cite a substantial number of cases in support of their argument that the deprivation of outdoor exercise is cruel and unusual punishment. Most of these cases involved situations in which the overall conditions in a prison were unconstitutional; the court, in granting injunctive relief, required that inmates receive a certain amount of time for outdoor exercise. *See, e.g., Campbell v. Cauthron,* 623 F.2d 503, 507 (8th Cir.1980); *Mitchell v. Untreiner,* 421 F.Supp. 886, 901 (N.D.Fla.1976). These cases are largely irrelevant to our inquiry, because a court that is fashioning injunctive relief to cure cruel and unusual prison conditions may go beyond the minimum requirements of the Constitution. *See Miller v. Carson,* 563 F.2d 741, 751 (5th Cir.1977).

A few cases, however, explicitly hold that the long-term denial of outdoor exercise is cruel and unusual punishment in violation of the Eighth Amendment. *See, e.g., Rhem v. Malcolm,* 371 F.Supp. 594, 627 (S.D.N.Y.1974); *Sinclair v. Henderson,* 331 F.Supp. 1123, 1131 (E.D.La.1971). In response, the defendants cite this court's statement that "deprivation of exercise per se does not violate the cruel and unusual punishment clause." *Miller,* 563 F.2d at 751 n. 12. Ultimately, however, none of these cases are persuasive for the simple reason that none of them was decided within the "unnecessary and wanton infliction of pain" framework that the Supreme Court has established in recent years.

6

deprived of his liberty such that due process is required. The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *see, e.g., Vitek v. Jones,* 445 U.S. 480, 492-93, 100 S.Ct. 1254, 1263-64, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital). The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300; *see, e.g., Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process); *cf. Dudley v. Stewart,* 724 F.2d 1493, 1497-98 (11th Cir.1984) (explaining how the state creates liberty interests).[9] In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state.

We conclude that the second situation is present here. Pursuant to the Florida Administrative Code, prisoners in Close Management are given two hours per week of yard time unless clear and compelling reasons exist to do otherwise. *See* Fla. Admin. Code Ann. r. 33-3.0083(9)(i). Prisoners therefore have a state-created interest in yard time. *Cf. Sheley v. Dugger,* 833 F.2d 1420, 1424 (11th Cir.1987) (holding that language in the Florida Administrative Code created a liberty interest for prisoners). Furthermore, deprivation of yard time imposes enough of a hardship to qualify as a constitutionally protected liberty interest. As noted previously, although the plaintiffs were deprived of only two hours of yard time per week,

---

[9]In *Dudley,* we held that the Due Process Clause protects *only* those liberties created by the state—in other words, apart from a state-created right, prisoners have no due process rights in regard to prison disciplinary proceedings. *See Dudley,* 724 F.2d at 1496-97. *Sandin,* however, decided by the Supreme Court subsequent to *Dudley,* made clear that in some situations the Due Process Clause applies "of its own force." *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300.

the marginal value of those two hours to a person in Close Management is substantial. Such a deprivation is therefore atypical and significant even in solitary confinement.[10]

Having concluded that the plaintiffs have a protected liberty interest in yard time, we now turn to the question whether the plaintiffs were afforded due process in conjunction with the deprivation of that interest. The minimum requirements of due process for prisoners facing disciplinary action (in this case, placement on the YSL) are (1) advance written notice of the charges; (2) a written statement of the reasons for the disciplinary action taken; and (3) the opportunity to call witnesses and present evidence, when consistent with institutional safety and correctional goals. *See Young v. Jones,* 37 F.3d 1457, 1459-60 (11th Cir.1994).

In this case, the plaintiffs were given written notice of the charges, but only after placement on the YSL.[11] We hold, however, that the failure to provide such notice in advance was irrelevant. It is a well-settled principle of law that "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney v. Pate,* 20 F.3d 1550, 1557 (11th Cir.1994). In this case, the plaintiffs were given a full appeal process (which they used repeatedly) after the decision to put them on the YSL was made. Furthermore, the purpose of the advance notice requirement is "to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." *Vitek,* 445 U.S. at 496, 100 S.Ct. at 1265. Those purposes were entirely fulfilled by the notice procedure used in this case. Finally, in light of the substantial deference to be accorded to

---

[10]Because we hold that the plaintiffs were deprived of a state-created liberty interest, we need not determine whether they were deprived of a liberty interest that would exist even apart from state policy—in other words, whether the deprivation of yard time "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300.

[11]For instance, one such notice (dated April 26, 1993) told each plaintiff that he had been added to the YSL "due to an incident which occurred on April 13, 1993." Although the notice does not specifically name the incident, the plaintiffs were surely aware that the referenced incident was their escape attempt.

prison officials in prison administration, *see Bell v. Wolfish,* 441 U.S. 520, 547-48, 99 S.Ct. 1861, 1878-79, 60 L.Ed.2d 447 (1979), we are hesitant to require strict compliance with the "advance" in the advance notice requirement. We therefore find that the notice in this case was sufficient.

In regard to the second requirement—a written statement of reasons—the plaintiffs were repeatedly made aware, in writing, of the reasons for their placement on the YSL.

The third requirement mandates that prisoners be given the opportunity to present evidence. This requirement, however, applies only when permitting a prisoner to present evidence would not jeopardize institutional safety. *See Ponte v. Real,* 471 U.S. 491, 499, 105 S.Ct. 2192, 2197, 85 L.Ed.2d 553 (1985). The plaintiffs in this case had repeatedly shown themselves to be a threat to the safety of the prison; it was therefore well within the defendants' discretion to deny them the opportunity to present evidence. *See Battle v. Barton,* 970 F.2d 779, 782-83 (11th Cir.1992) (holding that demonstrated uncooperativeness of inmate justified his absence from a disciplinary hearing). Furthermore, under the circumstances, the plaintiffs had no need to present evidence because the facts underlying the defendants' decision—the instances of misbehavior by the plaintiffs—were not in dispute.

In sum, the process given to the plaintiffs in conjunction with their placement on the YSL, although minimal, was sufficient to satisfy the requirements of the Due Process Clause.

C.

Finally, Bass and Bean challenge their placement on the YSL on the ground that it deprives them of their Fourteenth Amendment right to the equal protection of the laws. Bass and Bean allege that death row inmates are given four hours of yard per week, while persons on the YSL have none. Because non-death row inmates are not a protected class, we review this discriminatory treatment to see if it has a rational basis. *See Chandler v. Georgia Pub. Telecomms. Comm'n,* 917 F.2d 486, 489 (11th Cir.1990). It does: Death row inmates have not necessarily shown themselves to be a threat to the internal operations of the prison, while persons on the YSL have. We therefore reject the plaintiffs' equal protection claim.

9

III.

In addition to their substantive challenges to the district court's decision, the plaintiffs claim that the district court abused its discretion in denying their motions for appointment of an expert witness and appointment of counsel. *See Steele v. Shah,* 87 F.3d 1266, 1270-71 (11th Cir.1996) (noting that the denial of motions for an expert witness and for counsel are reviewed for an abuse of discretion). We find no abuse of discretion for the reasons stated in this section.

A.

The plaintiffs moved the court to appoint Dr. Michael L. Pollock, Professor of Medicine and Director of the Center for Exercise Science at the University of Florida, as an expert witness pursuant to Fed.R.Evid. 706. Dr. Pollock presumably would have testified as to the potentially harmful effects of the total deprivation of outdoor exercise. Such evidence would support a claim of cruel and unusual punishment by demonstrating that placement on the YSL involves the "infliction of pain," *see supra* part II.A, and might also support the plaintiffs' due process claim by demonstrating that placement on the YSL "imposes atypical and significant hardship" on inmates, thereby triggering due process protections, *see supra* part II.B. These elements of the plaintiffs' claims, however, are not in need of additional evidentiary support. Instead, as discussed previously, plaintiffs' cruel and unusual punishment claim fails because they have not shown that the infliction of pain was "unnecessary" or "wanton," and their due process claim fails because they have been given the process that was due. Thus, the testimony of Dr. Pollock was unnecessary, and the district court did not abuse its discretion by refusing to appoint him as an expert witness.[12]

B.

We also hold that the district court did not abuse its discretion by denying the plaintiffs' motion for appointment of counsel. A plaintiff in a civil case has no constitutional right to counsel. A court may,

---

[12]The plaintiffs did not request any form of medical exam that might have discovered that they suffered, or had suffered, severe physical or mental ailments that were willfully ignored by the defendants.

however, pursuant to 28 U.S.C. § 1915(e)(1), appoint counsel for an indigent plaintiff. The district court has broad discretion in making this decision, *see Killian v. Holt,* 166 F.3d 1156, 1157 (11th Cir.1999), and should appoint counsel only in exceptional circumstances, *see Dean v. Barber,* 951 F.2d 1210, 1216 (11th Cir.1992). In this case, there were no exceptional circumstances that would require the appointment of counsel. The core facts of the case—the conditions of the plaintiffs' confinement—are not in dispute, and their legal claims—violations of the Eighth and Fourteenth Amendments—are straightforward. The plaintiffs, like any other litigants, undoubtedly would have been helped by the assistance of a lawyer, but their case is not so unusual that the district court abused its discretion by refusing to appoint counsel.[13]

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[13]In conjunction with their appointment of counsel claim, the plaintiffs challenge the Florida State Prison's restrictive policies in regard to prisoner access to legal materials. This is in essence an access to courts claim, for which the plaintiffs must show "actual injury"—in other words, the plaintiffs must demonstrate that they had a legitimate claim that they were unable to pursue due to the prison's restrictions. *See Wilson v. Blankenship,* 163 F.3d 1284, 1290 (11th Cir.1998). No such showing has been made here.