[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 07 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15248

_____

D. C. Docket No. 05-00025-CV-6

JAMIL AL-AMIN,

Plaintiff-Appellee,

versus

WARDEN HUGH SMITH,
ADMIN. ASST. SANCHE M. MARTIN,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(January 7, 2008)**

Before TJOFLAT, HULL and WILSON, Circuit Judges.

HULL, Circuit Judge:

In this 42 U.S.C. § 1983 action, plaintiff-appellee, a state prisoner, alleges

that defendants-appellants repeatedly opened his privileged attorney mail outside of his presence and thereby violated his constitutional rights to access to the courts and free speech. Defendants appeal the denial of their motion for summary judgment on qualified immunity grounds. After review and oral argument, we reverse the district court's qualified immunity ruling as to plaintiff's access-to-courts claim but affirm as to plaintiff's free speech claim.[1]

## I. BACKGROUND

From 2002 to 2007, plaintiff Jamil Al-Amin was a prisoner at Georgia State Prison ("GSP"), operated by Georgia's Department of Corrections ("DOC").[2] Defendants are Hugh Smith, GSP warden, and Sanche Martin, his assistant.

### A. DOC's Mail Policy

The DOC policy known as "SOP IIB04-0001" provides certain mail privileges to inmates at Georgia prisons. Specifically, SOP IIB04-0001 provides that correspondence between inmates and their attorneys is "privileged mail." An inmate's attorney includes "any attorney with whom the inmate has had, or is attempting to establish, an attorney client relationship" and who is licensed to

---

[1]The parties consented to transfer the case to a magistrate judge, but, for simplicity, we use the term "district court."

[2]Al-Amin entered the DOC on March 23, 2002. In August 2007, the state transferred Al-Amin to a federal prison, citing security concerns. Al-Amin is still serving a state life sentence but is housed in a federal facility.

practice in state or federal courts. The policy provides for <u>external</u> inspection of privileged mail "by fluoroscope, metal detecting device, or manual inspection for the purpose of detecting contraband."[3]

Following an external inspection, "an appropriately designated staff member may open and inspect (but <u>not</u> read) all privileged mail <u>in the presence of the inmate/probationer</u> to whom it is addressed." Thus, under DOC's own policy, GSP may not read Al-Amin's attorney mail and may open it only in his presence.[4]

## B. Mail from Al-Amin's Wife

In 2002, plaintiff's wife, Karima Al-Amin ("Karima") began sending legal correspondence marked "legal mail" to him. Karima is a licensed attorney practicing in Atlanta, Georgia.

From April 13, 1999 to August 1, 2004, defendant Martin oversaw the daily operations of the prison mailroom.[5] Martin admits that, in April 2002, she accidentally opened a letter from Karima. As Martin resealed the letter, she saw that Karima was an attorney and that the letter came from Karima's law office.

---

[3]The DOC policy also states that incoming privileged mail "shall be treated as privileged only if the name and official status of the sender appears commercially printed on the envelope." Incoming privileged mail may be held for two days to allow officials to verify the privileged status of the sender.

[4]In this opinion we use the terms "privileged mail" and "attorney mail" interchangeably.

[5]During the Christmas holidays in 2004 and 2005, Martin also worked in the mailroom but did not supervise any mail staff at that time.

Martin informed Warden Smith that Al-Amin had received "mail of a personal nature" from his attorney-wife.

In May 2002, Warden Smith asked Al-Amin for a list of his attorneys of record. Smith asked for the list because Al-Amin had a number of attorneys and Smith did not want mailroom staff opening Al-Amin's legal mail outside Al-Amin's presence. Al-Amin gave Smith the names of five attorneys, but did not include Karima.[6] Because Al-Amin did not identify Karima as one of his attorneys, Smith informed Martin and other mailroom staff that Karima's letters should be treated as regular mail. According to Smith and Martin, Al-Amin and Karima never informed them that Karima was representing Al-Amin.

## C.    August 2003 Grievance

In 2003, Officer James Jones, who brings legal mail to inmates, told Al-Amin that Martin was opening legal mail from Karima. Al-Amin then filed an August 2003 grievance alleging that Martin had "knowingly[,] ignoring and disregarding D.O.C. Policy, instructed that my Legal Mail is to be opened." Al-Amin's grievance listed his nine attorneys, including his wife. Al-Amin requested that his privileged mail be treated as such.

---

[6]The attorney list is contained in a memorandum from Warden Smith to the inmate file, which states that Al-Amin "submitted the below list" to Lt. Larry Brewton. While Al-Amin does not remember submitting a list in May 2002, he does not deny that this occurred.

On September 19, 2003, Warden Smith denied the grievance, stating that "[n]o evidence was found to support the allegations you made against Ms. Martin. Mail is processed within established guidelines." On September 25, 2003, Al-Amin filed a grievance appeal, repeating his allegations and stating that "[m]y wife is one of my lawyers and should be shown the respect of any attorney."

On November 13, 2003, as part of the grievance investigation, Theresa Jarriel submitted a sworn statement based on a telephone interview with Martin. Martin told Jarriel that: (1) when Al-Amin came to GSP, he received legal mail in envelopes with preprinted business labels from his wife; (2) "a lot of the privileged mail had personal letters in it although some of the envelopes contained legal transcripts and such"; and (3) because Al-Amin was asked to list his attorneys and Karima was not included, Warden Smith instructed mailroom staff to open all mail received from Karima, whether privileged or not, before taking it over to Al-Amin's building.

On November 14, 2003, Warden Smith submitted a sworn statement that "Al-Amin's legal mail received from any attorney of record is opened in his presence as established in policy. Mail received from his wife who I am told is an attorney or legal representative has been opened outside of inmate Al-Amin's presence." On November 18, 2003, Smith sent a memorandum to the DOC's

5

Assistant Regional Director and the lead investigator for Inmate Affairs and Appeals stating that mail arriving for Al-Amin would be processed as privileged mail as long as it met the criteria under the mail policy.

**D.     November 25, 2003 Grievance Response**

On November 25, 2003, Raymond Head, manager of the Inmate Affairs Unit, issued a grievance response. According to Head's response, Al-Amin's allegation was "referred to the appropriate staff for appropriate action to ensure this does not occur again in the future." Warden Smith received Head's grievance response and instructed Martin to now treat all mail from Karima as legal, privileged mail and to open it in Al-Amin's presence. Martin, in turn, instructed the mailroom staff to treat mail from Karima as legal mail.

In her affidavit, Martin states that after November 25, 2003, she treated all of Karima's mail as legal mail and she never opened any of it outside Al-Amin's presence.[7] Martin avers that she never instructed or permitted any individuals to inspect Al-Amin's privileged mail.[8] If any of Karima's mail was opened outside

_____

[7]Prison records indicate that the only time that Al-Amin's privileged mail was opened outside of his presence was December 31, 2002, when a letter from Associated Legal Services was opened by mistake. However, we note that Martin herself admits opening a letter from Karima's law office in April 2002. Also, Warden Smith admits that in 2002 he informed Martin and the mailroom staff that letters from Karima should be treated as regular mail.

[8]As the warden's designee under the mail policy, Martin was permitted to inspect Al-Amin's nonprivileged mail outside his presence.

6

Al-Amin's presence after November 25, 2003, Martin states, "it was inadvertently done by the mail room sorter."

According to Warden Smith's affidavit, he was not aware that any of Karima's mail was treated as non-privileged after November 25, 2003. Had Smith known that mailroom employees were treating Karima's mail as non-privileged, he would have corrected the situation.

In contrast, Al-Amin testified that legal mail from Karima continued to be opened outside his presence even after Head's November 25, 2003 grievance response. Al-Amin points to thirteen envelopes (attached to his complaint) mailed between June 28, 2004 and February 8, 2005 as legal mail opened outside his presence.[9] Further, in 2005, Karima questioned Warden Smith about the continual opening of Al-Amin's legal mail. Smith replied that the opened mail from Karima was mail from her home of a personal nature. Karima informed Smith that all communications had been duly marked as "legal mail" and that she had not sent any mail from her home.

### E.    Al-Amin's Complaint

---

[9]Al-Amin's complaint describes a second grievance ("No. 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"), filed on October 14, 2004, which alleged that his privileged mail was still being opened and read outside of his presence. Warden Smith denied the grievance, and Al-Amin appealed. On December 1, 2004, Head informed Al-Amin that every effort was being made by mailroom staff to ensure that all legal mail was opened in the presence of the prisoner to whom it was addressed. The record contains no other evidence of this grievance.

On March 21, 2005, Al-Amin filed a § 1983 complaint against Warden Smith and Martin in their individual capacities.[10] Attached to the complaint are photocopies of the thirteen envelopes between June 28, 2004 and February 8, 2005, which he alleges were improperly opened before reaching him.[11] The return address on each envelope is Karima's law office address and each is marked "legal mail." Four of the envelopes are also marked "attorney-client privilege." Al-Amin's lawsuit seeks damages for only these thirteen letters.[12]

However, as background, Al-Amin's complaint stresses that during 2003 defendants had previously opened and read his attorney mail and been told to stop. According to Al-Amin's complaint, during 2003, Martin knowingly violated the DOC policy by instructing mailroom staff to open and read his legal mail outside his presence and GSP staff continued to do so even after Head's November 25, 2003 directive to treat Al-Amin's legal mail as privileged.

Al-Amin's complaint further alleges that Martin's authorizing of GSP

---

[10]Al-Amin also sued defendants in their official capacities. In a July 18, 2005 order, the district court dismissed the official capacity claims as barred by the Eleventh Amendment. Al-Amin did not appeal this ruling, and thus we do not address his official capacity claims.

[11]Although there are fourteen envelopes, the parties refer to thirteen envelopes and we assume that they are dropping the one that is not legible.

[12]At his deposition, Al-Amin testified that after his complaint was filed, he received a piece of "legal" mail that was opened. On August 23, 2005, Officer Oliver took a letter from Karima to Al-Amin and stated that "it's already been opened." There is no testimony about what was on the front of the envelope, and Al-Amin has not filed this envelope in the record.

mailroom staff to continue to open and read all of Al-Amin's privileged mail from Karima violated not only the DOC mail policy but also his constitutional rights. As to Warden Smith, the complaint alleges that, after Al-Amin's grievance was sustained, Smith knowingly failed to take corrective actions to ensure that Al-Amin's legal mail was not opened and read outside Al-Amin's presence, thereby violating his constitutional rights.

Al-Amin requests: (1) a declaratory judgment that defendants violated his constitutional rights; (2) a permanent injunction ordering defendants to open his attorney mail only in his presence; (3) nominal and punitive damages; and (4) attorney's fees.[13]

## F.    Cross Motions for Summary Judgment

Defendants' motion for summary judgment argued that Al-Amin had shown no constitutional violation because Al-Amin: (1) did not list his wife on his attorney-of-record list and therefore his wife's mail was not privileged; and (2) did

---

[13]Although Al-Amin initially alleged that GSP staff <u>read</u> his attorney mail, Al-Amin also claimed that even if his mail was not <u>read</u>, he has a constitutional right to have his properly marked attorney mail <u>opened only in his presence</u>, apart from his right to receive unread attorney mail. The district court's orders on appeal addressed only Al-Amin's "mail opening" claim and its limiting its orders to Al-Amin's "mail opening" claim is not challenged before this Court.

Indeed, defendants do not contend that they are entitled to read Al-Amin's attorney mail. Nor do defendants deny that the law is well established that Al-Amin has a constitutional right that precludes them from reading Al-Amin's attorney mail. Instead, defendants contend that there was no well-established constitutional right requiring them to open attorney mail only in Al-Amin's presence. For these reasons, we address only Al-Amin's "mail opening" claim.

not articulate any actual injury caused by his alleged denial of court access. Defendants also argued that they were entitled to qualified immunity because they had no fair warning that their actions were unconstitutional.

In response, Al-Amin moved for summary judgment, arguing that: (1) defendants knew that Karima's letters were privileged attorney mail from the envelopes themselves, which bore her law firm address and were labeled "legal mail"; (2) the DOC mail policy did not require Al-Amin to list his attorneys; and (3) even after Head's November 25, 2003 instruction not to open legal mail from Karima outside Al-Amin's presence, defendants continued to do so.

## G. District Court's Two Orders

In an August 23, 2006 order, the district court denied the parties' cross motions for summary judgment as to Al-Amin's attorney mail claim.[14] The district court concluded the law was clearly established in 2003-04 that prison officials violate an inmate's First Amendment rights by opening properly marked legal mail outside the inmate's presence.[15] However, the district court determined that

---

[14]Al-Amin's complaint also contains a retaliation claim, which the district court dismissed without prejudice due to Al-Amin's failure to exhaust his administrative remedies on that claim. This appeal does not involve Al-Amin's retaliation claim.

[15]The district court noted that for mail to be treated as privileged legal mail, the state may require: (1) that legal mail be specially marked as originating from an attorney with the attorney's name and address; and (2) that an attorney desiring to communicate with a prisoner first identify herself and her client to prison officials to assure that letters marked privileged are actually from members of the bar. See Wolff v. McDonnell, 418 U.S. 539, 576-77, 94 S. Ct

material fact issues existed as to whether the mail in question met the standards for privileged mail, whether prison officials required Al-Amin to list his attorneys, and whether Al-Amin suffered actual injury.

The district court's September 19, 2006 order denied defendants' motion for reconsideration, concluding that Al-Amin's complaint stated claims for violations of his rights to access to the courts and free speech. Defendants appeal both orders.

## II.  QUALIFIED IMMUNITY

On appeal, Al-Amin does not challenge the DOC policy that permits GSP employees to open incoming attorney mail in his presence. Rather, Al-Amin's claims are that defendants, in repeatedly opening his attorney mail outside his presence, violated not only that prison policy but also his constitutional rights to access to the courts and free speech. In this interlocutory appeal, the sole question is whether defendants are entitled to qualified immunity on Al-Amin's access-to-courts and free speech claims.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly

2963, 2985 (1974). The district court observed that DOC's SOP IIB04-0001 required that attorney mail be specially marked, but did not require an attorney to first identify herself and her client to prison officials.

11

established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (citation omitted). To receive qualified immunity, a government official must first establish that he was acting within his discretionary authority. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007); Vinyard, 311 F.3d at 1346. Here, Warden Smith and Martin were acting within their discretionary authority as to inmates' mail.

Once a government official establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff. McClish, 483 F.3d at 1237; Vinyard, 311 F.3d at 1346. The Supreme Court has set forth a two-part test for qualified immunity. Vinyard, 311 F.3d at 1346 (citing Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508 (2002)). First, a court must undertake the threshold inquiry of whether the plaintiff's allegations, if true, establish a constitutional violation. Id. If a constitutional right would have been violated under the plaintiff's version of the facts, the next question is whether the constitutional right was clearly established. Id. The right must have been clearly established at the time of the alleged violation. Id. at 1349. Further, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001).

12

Stated another way, "the salient question . . . is whether the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Hope, 536 U.S. at 741, 122 S. Ct. at 2516.

We first analyze whether Al-Amin's claims establish any constitutional violations.

### III. AL-AMIN'S ACCESS-TO-COURTS CLAIM

**A.    Al-Amin's Version of Facts**

Defendants argue that even if opening attorney mail outside an inmate's presence violates the Constitution, Al-Amin has not shown a constitutional violation because he never listed Karima as one of his attorneys and there was no evidence that Karima was Al-Amin's attorney. The problem for defendants is that in qualified immunity cases on interlocutory appeal, we accept the plaintiff's version of the facts and resolve only legal questions. See Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir.), cert. denied, 128 S. Ct. 385 (2007); Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005); Vinyard, 311 F.3d at 1346 n.7.

Al-Amin testified that Karima was his attorney. All thirteen envelopes in issue were sent after Head's November 15, 2003 response sustaining Al-Amin's grievance about GSP improperly opening his attorney mail from Karima.

13

Although Karima was not on the May 2002 list, defendants knew, at least by November 25, 2003, that Karima was Al-Amin's attorney and that her properly marked attorney mail should be opened only in Al-Amin's presence. After receiving Head's response, defendants even gave instructions that Karima's legal mail should be opened only in Al-Amin's presence. The thirteen envelopes were all marked "legal mail" with Karima's full name and law office address on them, but were opened before reaching Al-Amin.[16] Accordingly, we reject defendants' argument that Al-Amin has not shown constitutional violations on this basis.

## B.    Clearly Established Law

Defendants alternatively argue that the law was not clearly established that opening attorney mail outside an inmate's presence violates his constitutional right to access to the courts.

The Supreme Court has long held that "prisoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494 (1977).[17] Further, under our binding precedent, a prisoner's constitutional right of

---

[16]While Martin contends that the envelopes may have been opened by "a mail sorter," the envelopes were undisputedly opened before reaching Al-Amin. Martin's affidavit uses the term "mail sorter" without explanation of whether that is a person or a machine. In either event, Al-Amin claims that his attorney mail was illegally opened outside his presence even after his grievance was sustained and defendants were instructed not to do so.

[17]The majority opinion in Bounds did not identify the constitutional provision underlying that right. See Bounds, 430 U.S. at 833-34, 97 S. Ct. at 1501 ("The [majority opinion] leaves us unenlightened as to the source of the 'right of access to the courts.'") (Burger, C.J., dissenting).

14

access to the courts requires that incoming legal mail from his attorneys, properly marked as such, may be opened only in the inmate's presence and only to inspect for contraband. See Taylor v. Sterrett, 532 F.2d 462 (5th Cir. 1976); Guajardo v. Estelle, 580 F.2d 748 (5th Cir. 1978).[18]

Defendants argue that Taylor and Guajardo are no longer good law due to the Supreme Court's intervening decision in Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254 (1987). Defendants point out that the Fifth Circuit, post-Turner, rejected the holdings of Taylor and Guajardo and argue that we should do the same. See Brewer v. Wilkinson, 3 F.3d 816 (5th Cir. 1993). Al-Amin responds that post-Turner, several other circuits have concluded that inmates have constitutionally protected rights to have properly marked attorney mail opened only in their presence. We review these cases in detail in order to explain why Taylor and Guajardo's holdings–that a prisoner has constitutional rights to have his attorney mail opened only in his presence–are not changed by Turner, and remain well-

---

Recently we indicated that the constitutional right of access to the courts is "grounded in the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, and/or the Fourteenth Amendment." Chappell v. Rich, 340 F.3d 1279, 1282 (11th Cir. 2003).

[18]See also Barlow v. Amiss, 477 F.2d 896, 898 (5th Cir. 1973) (stating that "[w]hile the control of prison mail is a matter of internal prison administration with which the federal courts are loath to interfere, the denial of free and unfettered communication between inmates . . . and attorneys may constitute a denial of federal constitutional rights") (citations omitted). In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

15

established law in this circuit.  We begin with Taylor and Guajardo.

## C.  **Taylor and Guajardo**

In Taylor, prison officials challenged a restriction, imposed by a district court order, forbidding them from opening an inmate's attorney mail except in that inmate's presence.  Taylor, 532 F.2d at 464.  The Taylor Court concluded that an inmate's constitutional right of access to the courts "supports that portion of the district court's order requiring that incoming prisoner mail from . . . attorneys . . . be opened only in the presence of the inmate."  Id. at 475.[19]

In reaching this result, the Taylor Court weighed "the burden on the prisoner's access to the courts against the legitimate governmental interest of prison security."  Id. at 472.  The Court noted that "[b]efore procedures that impede a prisoner's access to the courts may be constitutionally validated, it must be clear that the state's substantial interests cannot be protected by less restrictive means."  Id.  The government interest was "jail security as affected by the

---

[19]Although Taylor also addressed other types of mail between inmates and prosecuting attorneys, courts, and probation/parole officers, we focus on only attorney mail in this case.

Additionally, prison officials in Taylor challenged the district court's ruling that attorney mail could not be opened, even in an inmate's presence, unless "there is a reasonable possibility that contraband is included in the mail . . . ." Id. at 464.  We upheld the requirement of opening only in the inmate's presence as constitutionally compelled, but rejected the additional restriction that there must be a "reasonable possibility" of contraband before opening the mail to check for contraband. Id. at 469.  The Taylor Court noted, however, that "[t]his inspection is limited to locating contraband.  It does not entail reading an enclosed letter.  It should be emphasized that this requirement does not preclude a 'probable cause' search or seizure of the envelope and its contents in the appropriate circumstances." Id. at 475.

16

introduction of contraband into the jail and by the communication of escape plans or other . . . criminal activities." Id. at 473.  The Court identified the "basic prisoner interest" in "uninhibited communication with attorneys."  Id. at 475.

The Taylor Court concluded that "[a]llowing the inspection of incoming inmate mail from [attorneys] only in the presence of the inmate accomplishes a compromise of [those] two important interests without sacrificing either of them." Id. at 477.[20]  "Prisoners are not inhibited in using this traditional communication medium to pursue their defense or to present their legal grievance.  And jail officials are not denied the use of any mail procedure shown to be essential to jail security."  Id.  In other words, the inmate's presence insures that attorney mail will not be read and prison officials are assured that the mail contains no contraband.[21]

---

[20]The Taylor Court looked to the Supreme Court's guidance from Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963 (1974).  However, because of the procedural posture in Wolff, the Supreme Court did not actually decide the issue of whether opening a prisoner's legal mail in the prisoner's presence was constitutionally required.  Instead, in Wolff, the petitioner-prison officials agreed that they could not open and read incoming legal mail but argued that they "may open all letters from attorneys as long as it is done in the presence of the prisoners."  Wolff, 418 U.S. at 575, 94 S. Ct. at 2984.  In agreeing that opening legal mail in a prisoner's presence was permissible, the Supreme Court concluded that "petitioners, by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires." Id. at 577, 94 S. Ct. at 2985.

[21]The Taylor Court, in holding that legal mail must be opened in the presence of the inmate, stated that "[c]onsistent with [Wolff], we think it permissible that prison officials require attorneys wishing to correspond confidentially with prisoners first to identify themselves by means of a signed letter."  Id. at 475 n.20.  The Court identified a procedure ordered by a district court as "one approach to this problem.  There, an attorney was required to enclose confidential writings in a sealed envelope to be mailed to the prison inside a larger envelope containing a signed letter."  Id. (discussing Marsh v. Moore, 325 F. Supp. 392 (D. Mass. 1971)).

17

Similarly, in Guajardo, prison officials appealed a district court's ruling that incoming attorney mail could be opened and inspected for contraband only in the inmate's presence. Guajardo, 580 F.2d at 757. The Guajardo Court followed Taylor's holding that "incoming [legal] mail could be opened only to inspect for contraband and in the presence of the inmate recipient." Id. at 758. The Court noted that Taylor's requirement "derived from the nature of the correspondence involved" and that "[t]he protection afforded extends only to attorneys representing or being asked to represent an inmate in either a criminal or civil matter." Id. at 758. The Court dismissed concerns about inmates using attorneys to violate prison rules because attorneys are bound by professional standards and would face criminal sanctions. Id. at 758-59. The Court concluded that "[t]he danger to prison security, order and rehabilitation does not outweigh the right of access to the courts." Id. at 759.

## D. **Turner v. Safley**

We would end our clearly established law analysis with Taylor and Guajardo but for the intervening Supreme Court decision in Turner, which adopted a more deferential, "reasonably related" test for determining whether prison practices impermissibly burden inmates' constitutional rights.

Although the prison regulations at issue in Turner involved inmate-to-inmate

18

correspondence and inmate marriages, Turner is important because it held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89, 107 S. Ct. at 2261; see Van Poyck v. Singletary, 106 F.3d 1558, 1560 (11th Cir. 1997) (stating Turner allows "prison rules to burden inmates' constitutional rights when reasonably related to a legitimate penological interest").[22]

The Turner Court identified four factors in determining the reasonableness of a prison regulation: (1) a "'valid, rational connection' between the prison regulation and the legitimate governmental interest"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) the impact that accommodation of the asserted constitutional right will have on guards, inmates, and the allocation of prison resources; and (4) the "absence of ready alternatives" to the regulation. Id. at 89-90, 107 S. Ct. at 2262.

Post-Turner, this Court has accorded "wide-ranging" and "substantial" deference to prisoner administrators in their execution of policies and practices that they consider necessary to preserve internal order and discipline and to maintain

---

[22]The Supreme Court upheld the restrictions on inmate-to-inmate correspondence, but invalidated the restrictions on inmate marriages. Id. at 91, 107 S. Ct. at 2262-63.

19

institutional security.  See Bass v. Perrin, 170 F.3d 1312, 1319 (11th Cir. 1999);

Lawson v. Singletary, 85 F.3d 502, 509-10 (11th Cir. 1996).  Such deference is

justified because of "the complexity of prison management, the fact that

responsibility therefor is necessarily vested in prison officials, and the fact that

courts are ill-equipped to deal with such problems."  Lawson, 85 F.3d at 510.

Before we apply Turner's factors to the mail-opening issue here, we review the

post-Turner split in other circuits about this issue.

**E.     Other Circuits Post-Turner**

Subsequent to Turner, the Fifth Circuit reconsidered Taylor and Guajardo

and rejected their holdings under Turner's "reasonably related" test.  See Brewer, 3

F.3d at 825.  The plaintiff-inmates in Brewer complained that their legal mail was

opened outside their presence, despite a prison policy requiring otherwise.[23]

Brewer involved broad "legal mail" which the Fifth Circuit described as "legal

mail from various courts, attorneys, and government officials."  Id. at 818.

The Fifth Circuit acknowledged prisoners' "constitutionally protected right

of access to the courts" but concluded that "what we once recognized in [Taylor] as

---

[23]The Texas Department of Criminal Justice had a policy whereby "Incoming Special
Correspondence from a specific named official will be delivered to the inmate sealed and
uninspected.  Incoming Special Correspondence not from a specific named official may be
opened and inspected for contraband only.  The inspection shall be in the inmate's presence."
Id. at 818 n.2.

20

being 'compelled' by prisoners' constitutional rights–i.e., that a prisoner's incoming legal mail be opened and inspected only in the prisoner's presence–is no longer the case in light of Turner and Thornburgh."[24]  Id. at 820, 825 (citation omitted).  The Fifth Circuit stated that Taylor's requirements of the least restrictive means and a substantial or important government interest "appear[ed] to have been modified" by Turner's "instruction that when a prison practice impinges on inmates' constitutional rights, whatever those rights might be, such a practice is valid if it is 'reasonably related to legitimate penological interests.'"  Id. at 823-25.  The Fifth Circuit noted that the prisoners did not allege "that their mail has been censored" and "they concede that such mail was opened and inspected for the 'legitimate penological objective' of prison security, i.e., to detect contraband."  Id. at 825.  The Fifth Circuit concluded that "the violation of the prison regulation requiring that a prisoner be present when his incoming legal mail is opened and inspected is not a violation of a prisoner's constitutional rights."  Id. at 825.

In contrast, several other circuits post-Turner have concluded that opening properly marked attorney mail outside a prisoner's presence infringes the constitutional right to access to the courts.  See Sallier v. Brooks, 343 F.3d 868,

---

[24]In Thornburgh v. Abbott, the Supreme Court applied Turner to a prison's regulation of incoming mail in the form of subscription publications. 490 U.S. 401, 407-19, 109 S. Ct. 1874, 1878-85 (1989).

21

877-78 (6th Cir. 2003) (concluding that no penological interest or security concern justifies opening attorney mail outside prisoner's presence when prisoner requested otherwise); Bieregu v. Reno, 59 F.3d 1445, 1458 (3d Cir. 1995) (disagreeing with Fifth Circuit's Brewer, and concluding the pattern and practice of opening inmate's properly marked incoming "court mail"[25] outside his presence fails the Turner reasonableness standard and violates inmate's rights to free speech and access to courts) (abrogated in part on other grounds by Lewis v. Casey, 518 U.S. 343, 116 S. Ct. 2174 (1996));[26] see also Kaufman v. McCaughtry, 419 F.3d 678, 686 (7th Cir. 2005) (stating, "when a prison receives a letter for an inmate that is marked with an attorney's name and a warning that the letter is legal mail, officials potentially violate the inmate's rights if they open the letter outside of the inmate's presence"); Davis v. Goord, 320 F.3d 346, 351-52 (2d Cir. 2003) (noting, "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts" but concluding two incidents of mail interference "are insufficient to state a

---

[25]In Bieregu, "court mail" was described as "correspondence between an inmate and a state or federal judge, clerk's office, or other courthouse address." 59 F.3d at 1449.

[26]See infra notes 32-33. Bieregu's holding that a prisoner is not required to show actual injury in an access-to-courts claim was later overruled by Casey. See Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997). However, the Third Circuit in Jones v. Brown expressly reaffirmed Bieregu's holding that a pattern and practice of opening an inmate's legal mail outside his presence violates his constitutional rights. See Jones, 461 F.3d 353, 358-59 (3d Cir. 2006), cert. denied, 127 S. Ct. 1822 (2007).

22

claim for denial of access to the courts because [the inmate] has not alleged that the interference with his mail either constituted an ongoing practice of unjustified censorship or caused him to miss court deadlines or in any way prejudiced his legal actions"); Powells v. Minnehaha County Sheriff Dep't, 198 F.3d 711, 712 (8th Cir. 1999) (concluding inmate stated constitutional claim based on officers opening legal mail when he was not present).[27]

The Third Circuit in Bieregu noted that although reading legal mail would infringe the right of access more than simply opening and inspecting it, "the only way to ensure that mail is not read when opened, and thus to vindicate the right to access, is to require that it be done in the presence of the inmate to whom it is addressed." 59 F.3d at 1456 (citing Wolff v. McDonnell, 418 U.S. 539, 576-77, 94

---

[27]Pre-Turner, several circuits concluded that inmates have constitutionally protected rights to have properly marked attorney mail opened only in their presence. See Washington v. James, 782 F.2d 1134, 1139-40 (2d Cir. 1986) (concluding that allegation that prison officials repeatedly opened outgoing attorney mail states a First Amendment claim); Jensen v. Klecker, 648 F.2d 1179, 1182-83 (8th Cir. 1981) (concluding that allegation that prison officials deliberately and repeatedly opened attorney mail outside prisoner's presence defeated defendants' motion for summary judgment); Ramos v. Lamm, 639 F.2d 559, 582 (10th Cir. 1980) (opening outgoing attorney mail outside inmate's presence violates First Amendment); Smith v. Robbins, 454 F.2d 696, 697 (1st Cir. 1972) (affirming district court order that attorney mail may not be opened in prisoner's absence because "[i]f the prisoner is present, he can see that the letter is not being read" and noting that otherwise, the resulting fear that mail will be read "may chill communications between the prisoner and his counsel"); cf. Smith v. Maschner, 899 F.2d 940, 944 (10th Cir. 1990) (concluding that where defendants opened one piece of prisoner's constitutionally protected legal mail by accident, "[s]uch an isolated incident, without any evidence of improper motive or resulting interference with Smith's right to counsel or to access to the courts, does not give rise to a constitutional violation").

23

S. Ct. 2963, 2984-85 (1974)).  Although Bieregu involved court mail, the Third

Circuit emphasized that "interference with attorney mail probably infringes the

right of court access even more than interference with court mail . . . .  Of all

communications, attorney mail is the most sacrosanct."  Id.  The Third Circuit

pointed out that providing inmates with confidential reliable means of

communication with their attorneys about grievances "releases tension in the

prisons and itself advances the state interest in maintaining institutional order and

security."  Id. at 1457.  The benefits of such a "safety valve" advances, rather than

frustrates, state interests.

The Third Circuit also concluded that opening legal mail in an inmate's

presence "places no burden at all on guards, prisoners, and the allocation of prison

resources: it is what the [prison] regulations have required since 1985."  Id. at

1458.  When opening mail in the prisoner's presence, the prison can check for

contraband then, which satisfies the state's security interest.  The Third Circuit,

however, was "careful to distinguish between a single, inadvertent opening of

properly marked legal mail outside an inmate's presence and a pattern or practice

of such actions."  Id.  "The former may not infringe a prisoner's right to free

speech, nor his right to court access absent a showing of actual injury."  Id.[28]

_____

[28]The Third Circuit acknowledged that its conclusion differed from the Fifth Circuit's
Brewer decision, but that its own conclusion "comports with the results reached by the majority

24

The Sixth Circuit also recently concluded that no penological interest or security concern justifies opening attorney mail outside a prisoner's presence when the prisoner specifically requested otherwise, and that the practice violates the prisoner's First Amendment rights.[29] See Sallier, 343 F.3d at 877-78.[30] Although not explicitly citing Turner itself, the Sixth Circuit articulated Turner's reasonably related standard and cited to Muhammad v. Pitcher, 35 F.3d 1081 (6th Cir. 1994), which did use the Turner factors. Sallier, 343 F.3d at 873, 877; see Muhammad, 35 F.3d at 1084-86 (analyzing procedure of opening inmate's incoming mail from state attorney general outside of his presence and concluding, "[a]ll four of the Turner factors indicate that the policy does not pass muster" under the First Amendment right).

## F.  Turner Did Not Change Our Well-Established Law

Applying Turner's factors to this case, we conclude that our well-established law in Taylor and Guajardo–that inmates have a constitutionally protected right to

---

of courts of appeals to consider these precise or similar issues." Bieregu, 59 F.3d at 1458.

[29]The Sixth Circuit noted that "[n]ot all mail that a prisoner receives from a legal source will implicate constitutionally protected legal mail rights," but when it does, "we must balance the interest of prison security against the possibility of tampering that could unjustifiably chill the prisoner's right of access to the courts or impair the right to be represented by counsel." Sallier, 343 F.3d at 874.

[30]In Sallier, the prison system's policy required that a prisoner make a written request that his legal mail be opened only in his presence. Id. at 874-75. The Sixth Circuit had previously found that this opt-in policy was sound. Id. at 874 (citing Knop v. Johnson, 977 F.2d 996, 1012 (6th Cir. 1992)).  Al-Amin made such a request.

25

have their properly marked attorney mail opened in their presence–is not changed by Turner and remains valid, well-established law. As to the first Turner factor, a "valid, rational connection" between the prison practice and a legitimate governmental interest, we fully recognize that the government has a strong interest in prison security. However, defendants do not dispute that attorneys are unlikely to send contraband, nor have they articulated a legitimate security interest in opening properly marked attorney mail outside Al-Amin's presence. Indeed, defendants can readily check for contraband if attorney mail is opened in the inmate's presence, and the DOC's own policy provides for opening attorney mail in the inmate's presence. Assuring the inmate of the confidentiality of inmate-attorney mail by opening such mail only in the inmate's presence actually advances the state's interest in promoting institutional order and security. See Bieregu, 59 F.3d at 1457. The first Turner factor thus favors Al-Amin.

As to the second Turner factor, Al-Amin has no other means of exercising his access-to-courts right where that access depends on confidentially communicating with his attorneys. Even if prison officials vow to open but not read attorney mail, courts have noted the inmates' lack of trust in that vow and fear that their attorney mail will be read. Opening attorney mail only in the inmate's presence ensures that the inmate's correspondence with his attorney is not inhibited

26

or chilled by his fear that this correspondence may be read by prison officials. See, e.g., Taylor, 532 F.2d at 476 (citing Robbins, 454 F.2d at 697).

As to the third factor, there is no showing that opening attorney mail in an inmate's presence burdens guards, prisoners, or the allocation of prison resources; as noted above, DOC policy already requires opening attorney mail in an inmate's presence. While opening all prison mail in an inmate's presence would pose an impermissible burden, we conclude properly marked attorney mail does not. As to the fourth factor, opening an inmate's attorney mail in his presence itself is the easy alternative; it "fully accommodates the prisoner's rights at de minimis cost to valid penological interests." Turner, 482 U.S. at 91, 107 S. Ct. at 2262. Thus, all four Turner factors weigh in Al-Amin's favor and Turner does not undermine Taylor's or Guajardo's holding.

Both parties cite our post-Turner decision in Lemon v. Dugger, 931 F.2d 1465 (11th Cir. 1991), but Lemon was a reading-attorney-mail case.[31] In contrast, Al-Amin claims a constitutional right to receive attorney mail unopened or to have attorney mail opened only in his presence, apart from his constitutional right to

---

[31]In Lemon, defendant-prison officials did not contest the prisoner's constitutional right not to have his mail read, but claimed that they had probable cause to read the mail and that this probable cause trumped Lemon's constitutional right not to have his mail read. Id. at 1468. In rejecting this claim, Lemon relied on Taylor's holding "that it was a violation of an inmate's constitutional rights for the prison officials to read legal mail." Id. at 1467 (emphasis added).

27

receive unread attorney mail.  Thus, Taylor and Guajardo, binding precedent from our predecessor court, speak more directly to the mail-opening issue.  Nonetheless, Lemon's reasoning does support our conclusion that the Turner factors favor Al-Amin.  Although not discussing Turner, the Lemon Court stressed that "'[t]he basic prisoner interest is an uninhibited communication with attorneys'" and that "'[p]risoners have a vital need to communicate effectively with [their attorneys].'"  Id. at 1467 (quoting Taylor, 532 F.2d at 475) (third alteration in original).  The Lemon Court shared Taylor's concern that "the essential role of postal communication cannot be ignored" because the fact of incarceration sharply restricts an inmate's means of communication with his attorney.  Id.  The Court noted that opening mail in an inmate's presence "insures that prison officials will not read the mail" and thus does not chill attorney-inmate communication.  Id. (quoting Wolff, 418 U.S. at 577, 94 S. Ct. at 2985).

Given this Court's precedent in Taylor, Guajardo, and Lemon, we conclude that: (1) a reasonable official would have known in 2004-05 that opening properly marked, incoming attorney mail outside the inmate's presence is unlawful and unconstitutional; and (2) Turner did not change our well-established law in that regard.  Al-Amin would be home free on his access-to-courts claim but for the Supreme Court's actual injury decision in Casey.

28

## G.    Actual Injury Requirement

Subsequent to Taylor, Guajardo, and Lemon, the Supreme Court clarified

that "actual injury" is a constitutional prerequisite to an inmate's access-to-courts

claim.  See Casey, 518 U.S. 343, 349, 116 S. Ct. 2174, 2179; Barbour v. Haley,

471 F.3d 1222, 1225 (11th Cir. 2006) (citing Casey and stating, "in order to assert

a claim arising from the denial of meaningful access to the courts, an inmate must

first establish an actual injury"), cert. denied, 127 S. Ct. 2996 (2007);[32] Perrin, 170

F.3d at 1320 n.13; Wilson v. Blankenship, 163 F.3d 1284, 1290 (11th Cir. 1998);

Bass v. Singletary, 143 F.3d 1442, 1445 (11th Cir. 1998).  "[P]rison officials'

actions that allegedly violate an inmate's right of access to the courts must have

impeded the inmate's pursuit of a nonfrivolous, post-conviction claim or civil

rights action."  Wilson, 163 F.3d at 1290; accord Singletary, 143 F.3d at 1445

(identifying the limited types of legal claims protected by the access-to-courts right

---

[32]The Supreme Court in Casey explained that the actual injury requirement in access-to-courts cases "derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." Casey, 518 U.S. at 349, 116 S. Ct. at 2179.  The Supreme Court explained that "[i]t is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." Id.  The Supreme Court added that "the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly." Id. at 350, 116 S. Ct. at 2179.

as nonfrivolous appeals from a conviction, habeas petitions, or civil rights suits).[33]

In order to show actual injury, "a plaintiff must provide evidence of such deterrence, such as a denial or dismissal of a direct appeal, habeas petition, or civil rights case that results from actions of prison officials." Wilson 163 F.3d at 1290-91; see also Perrin, 170 F.3d at 1320 n.13 (stating in an access-to-courts claim, "plaintiffs must show 'actual injury'–in other words, the plaintiffs must demonstrate that they had a legitimate claim that they were unable to pursue due to the prison's restrictions").

Here, Al-Amin has not alleged the requisite actual injury. Al-Amin stated that his wife handled all his cases, including a lawsuit, a habeas corpus petition (not yet filed), and the appeal of his criminal conviction. However, Al-Amin's testimony contains only a conclusory allegation that the mail opening compromised his cases and does not identify how any legal matters specifically were damaged. At most, Karima's affidavit states conclusorily that "[t]he violation of opening legal mail from my office over more than a three-year period has caused harm to the client/attorney privilege, confidentiality of legal matters, and in

---

[33]Other circuits also require actual injury to pursue a legal mail access-to-courts claim as a constitutional prerequisite under Casey. See, e.g., Kaufman, 419 F.3d at 686; Simkins v. Bruce, 406 F.3d 1239, 1243-44 (10th Cir. 2005); Oliver, 118 F.3d at 177-78. In Bieregu, 59 F.3d at 1455, the Third Circuit had held that a showing of actual injury was not required but in Oliver, it concluded that the Supreme Court's decision in Casey "ha[d] effectively overruled Bieregu" in that regard and that access-to-courts claims require a showing of actual injury. Oliver, 118 F.3d at 177-78.

satisfying deadlines." Her affidavit provides no specific cases or claims being pursued, nor any deadlines missed, nor any effect on Al-Amin's legal claims. Because Al-Amin has not shown the requisite actual injury, the district court erred in denying defendants qualified immunity on Al-Amin's access-to-courts claim.

## IV. FREE SPEECH CLAIM

### A. Constitutional Violation

Al-Amin also contends that defendants' conduct–repeatedly opening his attorney mail outside his presence–inhibited, chilled, and interfered with his communication with his attorney and consequently violated his constitutional right to free speech. After review, we agree with the district court's conclusions that (1) Al-Amin's free speech claim is distinct from his access-to-courts claim; (2) defendants' conduct violated his right to free speech; and (3) he need not show any actual injury beyond the free speech violation itself to state a constitutional claim.

The First Amendment, as incorporated by the Fourteenth Amendment, prohibits states from "abridging the freedom of speech." U.S. Const. amend. I. Mail is one medium of free speech, and the right to send and receive mail exists under the First Amendment. See City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 427, 113 S. Ct. 1505, 1515-1516 (1993) ("A prohibition on the use of the mails is a significant restriction of First Amendment rights. We have noted

31

that the United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is as much a part of free speech as the right to use our tongues.") (quoting Blount v. Rizzi, 400 U.S. 410, 416, 91 S. Ct. 423, 428 (1971)) (alteration and quotation marks omitted).

Further, it is well established that a prison inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974); see Turner, 482 U.S. at 95, 107 S. Ct. at 2265 (quoting this proposition from Pell); Hudson v. Palmer, 468 U.S. 517, 523, 104 S. Ct. 3194, 3198 (1984) (same); Lawson, 85 F.3d at 509 (same). As explained earlier, Al-Amin's use of the mail to communicate confidentially with attorneys about his cases is not inconsistent with his prisoner status or with legitimate penological objectives, but promotes the state's interest in institutional order and security. Indeed, given their incarceration and often distance from their attorneys, prisoners' use of the mail to communicate with their attorneys about their criminal cases may frequently be a more important free speech right than the use of their tongues. Thus, we conclude that Al-Amin has a First Amendment free speech right to communicate with his attorneys by mail, separate and apart from his constitutional right to access to the courts.

The closer question here is whether defendants' conduct violated that constitutional right to free speech. This is not a case where defendants censored inmates' mail or refused to deliver mail. Instead, defendants opened Al-Amin's attorney mail outside his presence before delivering it to him. The issue thus is whether defendants' pattern and practice of opening (but not reading) Al-Amin's clearly marked attorney mail outside his presence sufficiently chills, inhibits, or interferes with Al-Amin's ability to speak, protest, and complain openly to his attorney so as to infringe his right to free speech.

In answering this question, we are persuaded by the Third Circuit's decision in Jones v. Brown, which concluded that a state prison's "pattern and practice" of opening attorney mail outside the inmate's presence "interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech." Jones, 461 F.3d at 359.[34] The Third Circuit in Jones reasoned that the practice of opening

---

[34]Jones examined New Jersey's prison policy allowing it to open incoming "legal correspondence" outside the prisoners' presence in order to protect the safety and security of its prisons by reducing the risk of anthrax contamination. 461 F.3d at 356. The Third Circuit concluded that, three years after September 11 and the anthrax letters sent in October 2001, "there [wa]s no reasonable connection" between the opening policy and the asserted state interest, and, thus, the policy "d[id] not withstand constitutional scrutiny" under the Turner factors. Id. at 356, 363-64.

The "legal correspondence" in Jones included correspondence from courts and third parties, in addition to inmates' attorneys. Nothing herein rules as to legal mail in general because our case involves only attorney-client mail and our decision is necessarily limited to attorney-client mail only.

33

attorney mail outside the inmate's presence "deprives the expression of confidentiality and chills the inmates' protected expression, regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications." Id. The Third Circuit explained that "[t]his is so because 'the only way to ensure that mail is not read when opened . . . is to require that it be done in the presence of the inmate to whom it is addressed.'" Id. (quoting Bieregu, 59 F.3d at 1456 (citing Wolff, 418 U.S. at 576-77, 94 S. Ct. at 2984-85)); see also Davis, 320 F.3d at 351 ("Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.").

We also agree with the Third Circuit that the actual injury requirement applies to access-to-courts claims but not to free speech claims. See Jones, 461 F.3d at 359-60. Because the Supreme Court's Casey decision concerned an access-to-courts claim, the Third Circuit determined that "nothing in the reasoning of Casey . . . suggests that a prisoner . . . need allege any consequential injury stemming from [an alleged First Amendment] violation, aside from the violation itself." Id. at 359. The Third Circuit explained that while the provision of legal services and law libraries are means to ensure reasonable access to present constitutional claims to the courts, "protection of an inmate's freedom to engage in protected communications is a constitutional end in itself." Id. at 359-60.

34

In a similar vein, we have stated that "'[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.'" KH Outdoor, LLC v. City of Trussville, 465 F.3d 1256, 1260 (11th Cir. 2006) (quoting Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003)); see also Carey v. Piphus, 435 U.S. 247, 266-67, 98 S. Ct. 1042, 1053-54 (1978) (concluding that plaintiff could be compensated with nominal damages for procedural due process violations even absent proof of actual injury). We also have said that "nominal damages are . . . appropriate in the context of a First Amendment violation." KH Outdoor, 465 F.3d at 1261; see also McNamara v. Moody, 606 F.2d 621, 622, 625-26 (5th Cir. 1979) (affirming nominal damages award to prisoner whose freedom of speech right was violated when officials refused to mail letter to his girlfriend). Our precedent thus recognizes the award of nominal damages for violations of the fundamental constitutional right to free speech absent any actual injury.[35]

Because Al-Amin has stated a free speech violation and because actual injury is not a constitutional prerequisite to a free speech claim, the only remaining question is whether Al-Amin's free speech right to have his attorney mail opened

---

[35]Because our interlocutory jurisdiction extends only to qualified immunity legal issues, we do not address defendants' claim, made in the district court, that the Prison Litigation Reform Act bars Al-Amin from seeking nominal and punitive damages. See discussion of these issues in Smith v. Allen, 502 F.3d 1255 (11th Cir. 2007).

only in his presence was clearly established at the time of defendants' conduct.

## B.    Clearly Established Law

Defendants argue that they did not have "fair warning" that opening mail

from Karima outside Al-Amin's presence was a free speech violation and that,

therefore, they are entitled to qualified immunity on Al-Amin's free speech claim.[36]

Defendants stress that our binding precedent in Taylor, Guajardo, and Lemon was

based on the constitutional right to access the courts, not the right to free speech,

and thus Al-Amin's free speech right was not clearly established.  The question

becomes whether, for qualified immunity purposes, defendants have "fair warning"

when reasonable officials know that their precise conduct (opening an inmate's

attorney mail outside his presence) is unlawful and a constitutional violation, but

they do not know that it violates not only one constitutional right (the right to court

access), but also a second constitutional right (the right to free speech).

The problem with defendants' argument is that the "clearly established"

inquiry for qualified immunity focuses on the defendant's conduct and whether

given a particular factual situation, a reasonable official would know his conduct

was unlawful and unconstitutional.  See Hope, 536 U.S. at 741, 122 S. Ct. at 2516;

[36]Defendants' argument relies in part on their contention that Karima's mail, although showing her law office address and marked "privileged, legal mail," was not attorney mail.  As we have already explained, accepting the version of the facts most favorable to Al-Amin, by November 25, 2003, defendants knew that Karima was Al-Amin's attorney and that Karima's properly marked attorney mail should not be opened outside Al-Amin's presence.

Saucier, 533 U.S. at 202, 121 S. Ct. at 2156.  We have never required that, in order for an official to know his conduct is unlawful, a reasonable official must be able to cite by chapter and verse all of the constitutional bases that make his conduct unlawful.  Rather, what courts have said is that a high degree of factual similarity with conduct previously held unlawful and unconstitutional is required to give a reasonable official fair and clear warning (or notice) that his particular conduct is unlawful and unconstitutional.  See, e.g., Hope, 536 U.S. at 740-41, 122 S. Ct. at 2515-16; Vinyard, 311 F.3d at 1353.

In this case, exact factual identity exists between prior case law and defendants' factual conduct.  Specifically, our precedent, as discussed above, clearly establishes that a prison official violates an inmate's constitutional rights when the official opens attorney mail outside the inmate's presence.  See Taylor, 532 F.2d at 462; Guajardo, 580 F.2d at 748.[37]  Thus, we conclude that defendants had fair and clear notice that opening Al-Amin's attorney mail outside his presence was unlawful and violated the Constitution.  See Vinyard, 311 F.3d at 1350 ("'[I]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.'" (quoting Saucier,

---

[37]In addition to our prior case law, the GSP's own regulations provide that an inmate's incoming attorney mail should be opened in the inmate's presence.  While the regulations themselves do not constitute constitutional law, they further undermine any claim by defendants that they were unaware of their legal obligations in handling Al-Amin's mail.

533 U.S. at 202, 121 S. Ct. at 2156-57)).  Accordingly, we affirm the district court's denial of qualified immunity on the free speech claim.[38]

## V.  CONCLUSION

For these reasons, we reverse the district court's denial of qualified immunity on Al-Amin's access-to-courts claim and affirm on his free speech claim.

**AFFIRMED IN PART AND REVERSED IN PART.**

---

[38]In their <u>reply</u> brief, defendants raise two additional arguments: (1) even if Al-Amin suffered constitutional violations, they still cannot be held liable because they did not personally participate in the illegal conduct that gave rise to the constitutional violations; and (2) there is insufficient evidence of a pattern, practice, or policy of opening attorney mail to establish supervisory liability.  However, defendants neglected to make these arguments in their initial brief on appeal, and our precedent unambiguously provides that "[i]ssues that are not clearly outlined in an appellant's initial brief are deemed abandoned."  <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999); <u>see also</u> <u>United States v. Levy</u>, 416 F.3d 1273, 1276 n.3 (11th Cir. 2005) (collecting cases and observing this Court "declines to consider issues raised for the first time in an appellant's reply brief").